IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

NICKIE A BEECH,

        Plaintiff,

vs.                                    CASE NO. 1:13-cv-95-MP-GRJ

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

        Defendant.

_____/

## REPORT AND RECOMMENDATION

Plaintiff appeals to this Court from a final decision of the Commissioner of Social Security (the "Commissioner") denying Plaintiff's application for supplemental security income pursuant to Title XVI of the Social Security Act (the Act).  (Doc. 1.)  The Commissioner has answered (Doc. 8), and both parties have filed briefs outlining their respective positions.  (Docs. 14, 18.)   For the reasons discussed below, the Commissioner's decision should be **AFFIRMED**.

## I. PROCEDURAL HISTORY

Plaintiff applied for supplemental security income under Title XVI on August 14, 2008, alleging disability beginning on that date due to physical impairments including a bad heart, shortness of breath, collapsed lung, and liver problems.  (R. 170-72, 194-207.)   Plaintiff lived in Lansing, Michigan, when the application was filed but he moved to Chiefland, Florida, later that year and his case was transferred to a Florida DDS office.  (R. 57, 220, 523-24.)  His application was denied initially and upon reconsideration.  (R. 59-62, 69.)  A hearing was held before an Administrative Law

Judge (ALJ) on March 22, 2011, and the ALJ denied Plaintiff's claims in a decision

dated November 17, 2011. (R. 7-25.)  The Appeals Council denied Plaintiff's request for

review, rendering the ALJ's decision the Commissioner's final decision.  (R. 1-5.)  On

May 22, 2013, Plaintiff filed the instant appeal to this Court.  (Doc. 1.)  On appeal,

Plaintiff raises one issue:  that the ALJ failed to fully and fairly develop the record

regarding Plaintiff's IQ by either obtaining Plaintiff's school records or ordering an IQ

test, or both.  (Doc. 14.)

## II. <u>STANDARD OF REVIEW</u>

The Commissioner's findings of fact are conclusive if supported by substantial

evidence.[1] Substantial evidence is more than a scintilla, i.e., the evidence must do more

than merely create a suspicion of the existence of a fact, and must include such

relevant evidence as a reasonable person would accept as adequate to support the

conclusion.[2]

Where the Commissioner's decision is supported by substantial evidence, the

district court will affirm, even if the reviewer would have reached a contrary result as

finder of fact, and even if the reviewer finds that the evidence preponderates against

the Commissioner's decision.[3] The district court must view the evidence as a whole,

---

[1] *See* 42 U.S.C. § 405(g) (2000).

[2] <u>Foote v. Chater</u>, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing <u>Walden v. Schweiker</u>, 672 F.2d 835, 838 (11th Cir. 1982) and <u>Richardson v. Perales</u>, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)); *accord,* <u>Edwards v. Sullivan</u>, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

[3] <u>Edwards</u>, 937 F.2d at 584 n.3; <u>Barnes v. Sullivan</u>, 932 F.2d 1356, 1358 (11th Cir. 1991).

taking into account evidence favorable as well as unfavorable to the decision.[4]

However, the district court will reverse the Commissioner's decision on plenary review if

the decision applies incorrect law, or if the decision fails to provide the district court with

sufficient reasoning to determine that the Commissioner properly applied the law.[5]

The law defines disability as the inability to do any substantial gainful activity by

reason of any medically determinable physical or mental impairment that can be

expected to result in death, or has lasted or can be expected to last for a continuous

period of not less than twelve months.[6]  The impairment must be severe, making

Plaintiff unable to do his previous work, or any other substantial gainful activity which

exists in the national economy.[7]

The burden of proof regarding the plaintiff's inability to perform past relevant

work initially lies with the plaintiff.[8]  The burden then temporarily shifts to the

Commissioner to demonstrate that "other work" which the claimant can perform

currently exists in the national economy.[9]  The Commissioner may satisfy this burden

---

[4] Foote, 67 F.3d at 1560; *accord,* Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (holding that the court must scrutinize the entire record to determine reasonableness of factual findings); Parker v. Bowen, 793 F.2d 1177 (11th Cir. 1986) (finding that the court also must consider evidence detracting from evidence on which the Commissioner relied).

[5] Keeton v. Dep't Health and Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994).

[6] 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505 (2005) (All further references to 20 C.F.R. will be to the 2005 version unless otherwise specified.).

[7] 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

[8] Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987); *see also* Doughty v. Apfel, 245 F. 3d 1274, 1278 (11th Cir. 2001).

[9] Doughty, 245 F.3d at 1278 n.2. In Doughty the court explained this burden shifting as follows:

In practice, the burden temporarily shifts at step five to the Commissioner. The

by pointing to the Medical-Vocational Guidelines (the "Grids") for a conclusive determination that a claimant is disabled or not disabled.[10]

However, the ALJ should not exclusively rely on the Grids when "the claimant has a non-exertional impairment which significantly limits his or her basic work skills or when the claimant cannot perform a full range of employment at the appropriate level of exertion."[11]   In a situation where both exertional and non-exertional impairments are found, the ALJ is obligated to make specific findings as to whether they preclude a wide range of employment.[12]

The ALJ may use the Grids as a framework to evaluate vocational factors so long as he introduces independent evidence of the existence of jobs in the national economy that the claimant can perform.[13]   Such independent evidence may be introduced by a Vocational Expert's ("VE") testimony, but this is not the exclusive means of introducing such evidence.[14]   Only after the Commissioner meets this burden

---

Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform.  In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.) (Internal citations omitted).

[10] Walker, 826 F.2d at 1002 ("[T]he grids may come into play once the burden has shifted to the Commissioner to show that the claimant can perform other work.").

[11] Wolfe v. Chater, 86 F.3d 1072, 1077 ( 11th Cir. 1996). See Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Walker, 826 F.2d at 1003 ("The grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation.").

[12] Walker, 826 F.2d at 1003.

[13] Wolfe, 86 F.3d at 1077-78.

[14] See id.

does the burden shift back to the claimant to show that he or she is not capable of performing the "other work" as set forth by the Commissioner.

## III.  SUMMARY OF THE RECORD

Plaintiff's medical records relate primarily to his physical impairments.  The portions of the record that are relevant to the issue on appeal may be summarized as follows.  In his initial disability application, Plaintiff reported that he completed school through the 11th grade and did not attend special education classes.  (R. 203.)  In function reports completed in 2009 with the assistance of his sister and girlfriend, Plaintiff reported that his daily activities were limited to watching television and taking short walks due to his physical impairments.  (R. 212-15, 217.)  His reported hobbies were reading, watching television, and playing video games.  (R. 216, 243.)   Except for "memory," Plaintiff did not check any items pertaining to mental abilities on a list of items affected by his condition, but he did note difficulties with following instructions. (R. 217, 244.)   In his initial report, he stated that he was able to pay bills and count change, but could not handle a savings account or use a checkbook due to confusion. (R. 215.)  In an updated report, he stated that he was able to do all of those things.  (R. 242.)

Plaintiff underwent a consultative psychological evaluation by Dr. Diana Benton, Psy.D., on November 18, 2009.  (R. 599-603.)   Plaintiff reported feeling depressed, having difficulty sleeping, and having diminished interest in activities such as basketball and fishing.  Plaintiff reported that he began feeling depressed in 1998.  He reported that he was capable of all necessary self-care, and could perform household tasks

when not impeded by his physical problems.  He could manage his own finances.  He interacted with friends and family on a daily basis and attended church weekly.  (R. 600.)

Plaintiff reported to Dr. Benton that he completed the eleventh grade and then dropped out of school.  He stated that he was in ESE (Exceptional Student Education) from first through the ninth grades.  Plaintiff had a history of legal problems beginning when he was 12 years old, and was jailed in 2008 for failure to pay child support.  Plaintiff has three children who live in Michigan.  (R. 600-01.)

On the mental status examination, Dr. Benton noted that Plaintiff evidenced no expressive or receptive difficulties with speech and was able to engage appropriately in conversation.  His thought processes were logical and goal oriented, and he was  well oriented to person, place, and time.  His immediate, recent, and remote memories were intact, but he had difficulty spelling "world"  backwards.  Plaintiff was able to name the current U.S. president, several past presidents, and oceans.  He could not name the capitol of Florida, but knew the capitol of Michigan.  Plaintiff performed serial sevens subtraction with four of five correct, and performed mental addition of double digit numbers and simple multiplication.  Plaintiff was able to interpret one common saying and was concrete in his interpretation of a second saying.  Judgment and insight were normal.  (R. 601.)

Dr. Benton diagnosed Plaintiff with "adjustment disorder with depressed mood", insomnia, and noted "R/O borderline intellectual functioning."  Dr. Benton recommended assessment of Plaintiff's physical limitations, and opined that from a

mental standpoint Plaintiff had adequate capacity in the areas of understanding and memory, concentration, persistence, social interaction, and adaptation to perform appropriate work.  She concluded that Plaintiff would be able to manage his own funds. (R. 602.)

State agency psychological consultant Gary Buffone, Ph.D., reviewed the record, including Dr. Benton's consultative report, and concluded that Plaintiff had only mild limitations in two functional areas: restrictions of activities of daily living and difficulties in maintaining concentration, persistence, or pace.  (R. 604-16.)

Plaintiff was 36 years old at the time of the hearing.  He testified that he completed school through the ninth grade.  Plaintiff testified regarding the limitations on his activities stemming from his physical impairments.  His usual non-physical activities included watching television, listening to the radio or music, doing crossword puzzles, and reading novels by James Patterson.  He has a driver's license and drives occasionally.  In response to his attorney's questions, Plaintiff testified that he can read and write.  When asked what keeps him from working, Plaintiff cited his heart problems, weak left side, and back pain.  Plaintiff testified that he takes medication for insomnia and depression.  He sometimes has difficulty following the storyline in the James Patterson books.  (R. 30-44.)

A vocational expert testified that a hypothetical individual with Plaintiff's vocational profile, including a ninth grade education, could perform a significant number of jobs in the national economy at the light exertional level with certain postural limitations, in a low stress environment, with simple tasks.  The VE identified specific

unskilled occupations, including warehouse checker, small parts assembler, table worker, order clerk, and surveillance systems monitor.  (R. 44-49.)

The ALJ found that Plaintiff suffered from the severe impairments of COPD, cardiac arrhythmia, a liver problem, and an affective disorder, with no Listing-level impairments.  (R. 32-33.)   The ALJ concluded that Plaintiff had the residual functional capacity to perform light work with certain postural and environmental limitations, in a low-stress environment, consisting of simple tasks, and with the ability to use a mono-cane.  Plaintiff was unable to perform his past relevant work as a production assembler, but jobs did exist in significant numbers in the national economy that Plaintiff could perform, as described in the VE's testimony.  Accordingly, the ALJ concluded that Plaintiff was not disabled.  (R. 10-20.)

## IV.  DISCUSSION

Plaintiff raises only one issue on appeal: whether the ALJ failed to develop the record by not obtaining Plaintiff's school records and/or ordering IQ testing.  Doc. 14. Plaintiff asserts that his "severe academic and intellectual deficiencies are evidenced throughout the record. The Administration was on notice during the application process that Plaintiff Beech was illiterate and could not read and write well enough to complete forms without assistance."  Doc. 14 at 20.  Plaintiff contends that the ALJ should have assessed Plaintiff's "academic and educational deficiencies" and considered the requirements under Listing 12.05 for mental retardation.  *Id*. at 21.

There is no question "[t]hat the ALJ has a basic duty to develop a full and fair

record."[15]  As a Social Security administrative hearing is non-adversarial in nature,[16] the duty to develop the record is triggered when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence.[17]  An ALJ, however, "is not required to order a consultative examination as long as the record contains sufficient evidence for the administrative law judge to make an informed decision."[18]  In the end, however, "the claimant bears the burden of proving that he is disabled, and, consequently, he is responsible for producing evidence in support of his claim."[19]

Although Plaintiff's disability counsel in Michigan suggested that Plaintiff's intelligence might be an issue and requested IQ testing, Plaintiff was represented by Florida counsel following the transfer of the case and his Florida counsel neither requested such testing nor suggested that the ALJ obtain Plaintiff's school records during administrative review of Plaintiff's claim.  (R. 56, 139-40.)   Plaintiff specifically denied in his application that he attended ESE classes, though he reported to Dr. Benton that he had attended ESE classes through ninth grade, but left school after the eleventh grade.  Plaintiff did not assert low intelligence or mental retardation as an

---

[15]  Ellison v. Barnhart, 355 F.3d 1272, 1276 (11th Cir. 2003);  20 C.F.R. § 416.912(d) ("Before we make a determination that you are disabled, we will develop your complete medical history for at least the 12 months preceding the month in which you file your application . . . .").

[16]  Id.

[17]  See Mason v. Barnhart, 63 Fed. Appx. 284, 287 (9th Cir. 2003).

[18]  Ingram v. Comm'r Social Secur. Admin., 496 F.3d 1253, 1269 (11th Cir. 2007); see also Outlaw v. Barnhart, 197 Fed. Appx. 825, 828 (11th Cir. 2006)(per curiam)(noting that "the ALJ may order a physical or mental examination of a claimant at the government's expense; but the ALJ is not required to order an examination if it is not necessary to enable the ALJ to make a disability determination.").

[19]  Ellison v. Barnhart, 355 F.3d 1272, 1276 (11th Cir. 2003).

impairment at the hearing.  (R. 30-44; 203.)   The ALJ does not have a duty to develop the record regarding an impairment that Plaintiff did not present in his application or at the hearing.  (R. 30-44.); *see Robinson v. Astrue*, 365 Fed. Appx. 993, 995 (11th Cir. 2010) (unpublished) (citing *Pena v. Chater,* 76 F.2d 906, 909 (8th Cir. 1996)).

Even assuming, however, that the ALJ should have ordered an IQ test, it would not have made any difference with regard to meeting Listing 12.05C because there was no evidence that Plaintiff met the requirements of the Listing.  Unlike other mental disorders, the listing for mental retardation in Listing 12.05C requires that the claimant's impairment "satisf[y] the diagnostic description in the introductory paragraph" *and* any one of the four sets of criteria that follow it.[20]  In determining whether a claimant has "[met] a listing, a claimant must have a diagnosis included in the Listings and must provide medical reports documenting that the conditions meet the specific criteria of the Listings. . . ."[21]  Pursuant to 20 C.F.R. 404.1525(c), the introductory portion of each Listing defines or explains key specific medical findings which may be required to establish a diagnosis or confirm the existence of the impairment in order to meet the Listing.

Under Listing 12.05, an individual is mentally retarded if they have a "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or

---

[20]  20 C.F.R. Part 404, App. 1, Subpart P, 12.00A, ¶ 4.  Where adults have not had intelligence testing prior to age 18, a diagnosis of mental retardation satisfying the diagnostic requirement of this Listing could be inferred from the plaintiff's history and current functioning.  Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed. Reg. 50,746, 50,753 (Aug. 21, 2000) (to be codified at 20 CFR Parts 404 and 416).

[21]  Wilson v. Barnhart, 284 F.3d 1219, 1224 (11th Cir. 2002).

supports onset of the impairment before age 22."[22]   The definition of mental retardation

in the <u>DSM-IV</u> parallels the definition in the Listing.[23]   General intellectual functioning

refers to an IQ of about 70 or below on various standardized intelligence tests.[24]

In addition to the diagnosis of mental retardation, Listing 12.05C requires that the

claimant must have "a valid verbal, performance, or full scale IQ of 60 through 70 <u>and</u> a

physical or other mental impairment imposing an additional and significant work-related

limitation or function."[25]   As such, IQ alone is not enough to determine mental

retardation, as "[i]mpairments in adaptive functioning, rather than low IQ, are usually the

presenting symptoms in individuals with Mental Retardation."[26]  While the IQ often

remains stable, adaptive function can improve with training,[27] and therefore a valid IQ

score is not enough to determine if someone is mentally retarded.[28]  For example,

"mental retardation would not be diagnosed in an individual with an IQ lower than 70 if

---

[22] <u>Crayton v. Callahan</u>, 120 F.3d 1217, 1219 (11th Cir. 1997) (finding that at the very least, to be considered for disability benefits under Listing 12.05, the claimant must meet all parts of the diagnostic definition in the introductory paragraph: "(1) significantly subaverage general intellectual functioning; (2) have deficits in adaptive behavior; and (3) have manifested deficits in adaptive behavior before age 22." Once these three elements have been established, the court looks to paragraphs A ,B, C, and D to assess the severity of Plaintiff's mental retardation and its impairment on plaintiff's ability to work.

[23] "The essential feature of Mental Retardation is significantly subaverage general intellectual functioning that is accompanied by significant limitations in adaptive functioning in at least two of the following areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety." <u>DSM-IV</u> at 40.

[24] <u>DSM-IV</u> at 42.

[25] 20 C.F.R. Part 404, App. 1, Subpart P, 12.05(c).

[26] <u>DSM-IV</u> at 42.

[27] <u>Id.</u>

[28] "Mental Retardation would not be diagnosed in an individual with an IQ lower than 70 if there are no significant deficits or impairments in adaptive functioning." <u>See</u> <u>Lowery v. Sullivan</u>, 979 F.2d 835, 837(11th Cir. 1992) ("[A] valid IQ score need not be conclusive of mental retardation where the I.Q. score is inconsistent with the other evidence in the record on the claimant's daily activities and behavior.") (citing <u>Popp v. Heckler</u>, 779 F.2d 1497, 1499 (11th Cir. 1986)).

there are no significant deficits or impairments in adaptive functioning."[29]  Thus, in

addition to a qualifying I.Q. score Plaintiff must also demonstrate that he possessed "a

physical or other mental impairment imposing an additional and significant work-related

limitation of function."[30]

Plaintiff presented no evidence suggesting a sufficiently low IQ score or deficits

in adaptive functioning prior to the age of 22.  Although Dr. Benton's report raised the

issue of borderline intellectual functioning, she identified no adaptive deficits with

respect to Plaintiff's capacity for understanding and memory, concentration,

persistence, social interaction, and adaptation to perform work.  She concluded that

Plaintiff would be able to manage his own funds.  (R. 602.)   Dr. Buffone similarly

concluded that Plaintiff had only mild mental limitations in two functional areas:

restrictions of activities of daily living and difficulties in maintaining concentration,

persistence, or pace.  (R. 604-16.)   The evidence shows that Plaintiff had a driver's

license and was capable of a range of activities that included watching television,

reading novels, playing video games, attending church, and interacting daily with family

and friends.  Although Plaintiff's counsel asserts that he is "illiterate," Plaintiff clearly

testified during the hearing that he can read and write.  Doc. 14 at 20; R. 30-44.

Plaintiff's testimony regarding his functional limitations focused almost exclusively on

physical impairments.  (R. 30-44.)

---

[29] See Lowery v. Sullivan, 979 F.2d 835, 837(11th Cir. 1992) ("[A] valid IQ score need not be conclusive of mental retardation where the I.Q. score is inconsistent with the other evidence in the record on the claimant's daily activities and behavior.")(citing Popp v. Heckler, 779 F.2d 1497, 1499 (11th Cir. 1986)).

[30] 20 C.F.R. Part 404, App. 1, Subpart P, 12.05(c).

In short, Plaintiff did not present any evidence suggesting he had adaptive functioning difficulties nor does the record reflect that Plaintiff, even if additional IQ testing would have been ordered, would have met the requirements of Listing 12.05C.

## V.  RECOMMENDATION

In view of the foregoing, it is respectfully **RECOMMENDED** that the decision of the Commissioner should be **AFFIRMED.**

**IN CHAMBERS** in Gainesville, Florida, on June 3, 2014.

*s/ Gary R. Jones*

GARY R. JONES
United States Magistrate Judge

**NOTICE TO THE PARTIES**

A party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 14 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.